# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 07-568

**STATE OF LOUISIANA**

**VERSUS**

**GREGORY ANDERSON COUTEE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 281725
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Billy Howard Ezell, Judges.

**AFFIRMED.**

**James C. Downs**
**District Attorney - Ninth Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Monique Yvette Metoyer**
**Attorney at Law**
**2729 Overton Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
**Gregory Anderson Coutee**

**Gregory Anderson Coutee**
**Louisiana State Penitentiary**
**Hickory 2**
**Angola, LA 70712**

**EZELL, JUDGE.**

On March 22, 2006, the Defendant, Gregory Anderson Coutee, was originally charged with armed robbery. The bill of information was amended on June 21, 2006, charging the Defendant with first degree robbery, a violation of La.R.S. 14:64.1. A jury trial began on October 17, 2006, and the jury returned a guilty verdict on October 18, 2006. The Defendant was sentenced on October 27, 2006, to serve forty years at hard labor without benefit of probation, parole, or suspension of sentence. The Defendant is now before this court on appeal, asserting that the evidence is insufficient to convict him of first degree robbery, and that the trial court erred in denying his motion to suppress.

## FACTS

On January 23, 2006, the Defendant entered the Lexington Self Storage and robbed the owner, David Paulk, who was working that day. The Defendant was found that same day at the residence of Nicole Howard and was subsequently arrested on outstanding warrants. After the Defendant was read his *Miranda* rights, he confessed to the robbery and informed officers where the stolen items, a wallet and checkbook, could be found in the residence. Ms. Howard gave her consent to search the residence, and the stolen items were retrieved.

## ASSIGNMENT OF ERROR

By this assignment of error, the Defendant argues that the evidence was insufficient to convict him of first degree robbery. The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62

L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

First degree robbery is defined in La.R.S. 14:64.1, which states, in pertinent part:

A. First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon.

Thus, the State had the burden of showing that: 1. an object was taken; 2. the object had value; 3. the object belonged to another or was in the immediate control of another; 4. force or intimidation was used to take the object; and, 5. the victim believed the offender was armed with a dangerous weapon. In the instant case, the Defendant questions whether the State proved the element of force or intimidation to commit the taking while leading Mr. Paulk to believe he was armed with a dangerous weapon.

The victim, David Paulk, testified that he was working at his business, Lexington Self Storage, on the morning of January 23, 2006. He explained that around 10:00 a.m., the Defendant entered the business and inquired about renting a storage space. Mr. Paulk informed the Defendant that he did not have any of the size requested available. The Defendant left the building, and Mr. Paulk assumed that the Defendant had driven out the parking lot. Instead, the Defendant drove back behind

2

the storage buildings and parked his vehicle between the buildings, out of Mr. Paulk's sight.

Next, the Defendant entered the business again and asked Mr. Paulk to loan him twenty dollars. Mr. Paulk refused, and the Defendant asked him again. When Mr. Paulk refused the second time, Mr. Paulk testified that the Defendant jumped at him, grabbed him, pulled him up out of his chair and threw him in a storage closet. Mr. Paulk was fearful from the moment the Defendant first grabbed him because the Defendant was a much larger man and was a stranger to him. Mr. Paulk testified that he was 5'6" tall and weighed 170 pounds, whereas he believed the Defendant to be about 6'2" tall and weighing 240 pounds. At the time the Defendant was booked, he measured 6'0" tall and 245 pounds.

According to Mr. Paulk, the storage room was very well lit. Mr. Paulk hit the wall in the storage room with enough force to bust a hole in the sheetrock. Photographs of the storage closet and damage to the sheetrock were submitted into evidence as exhibits 6, 7, 11, 28, and 29. The Defendant subsequently got Mr. Paulk down on the floor and tied Mr. Paulk's hands behind his back with speaker wire he pulled off an old computer in the storage room. Mr. Paulk was able to break loose and the Defendant pulled the speaker wire off another computer and tied Mr. Paulk up again. As the men continued to fight in the closet, the Defendant got Mr. Paulk down on the floor and tied him up again with a piece of electrical wiring. The Defendant was on Mr. Paulk's back with Mr. Paulk's face down and his head against the floor. At that time, Mr. Paulk saw the Defendant reach behind himself and pull something from his waistband or a pocket. At that time, Mr. Paulk believed, without a doubt, that the Defendant was armed with a weapon. Mr. Paulk could not identify the object, only that it was brown colored. He thought the object was either the butt

3

of a gun or a knife.  Mr. Paulk was unable to look up and exactly identify the object.

Mr. Paulk stated that the Defendant did not touch him with the object, such as touching him with the tip of a gun or holding a knife against his neck.  Additionally, nothing was demanded of Mr. Paulk during the time the Defendant was holding the object and the Defendant never said that he had a weapon while they were in the storage room.

Mr. Paulk stated that he believed that the Defendant was going to kill him, so he decided to stop fighting in hopes that the Defendant would take what he wanted and leave the building.  He was not sure what the Defendant did with the object, but speculated that the Defendant put it back in his pocket or waistband.

Mr. Paulk testified that, at that time, the Defendant took his wallet and checkbook from his pocket and some cash that was on his desk.  Next, the Defendant told Mr. Paulk that he was getting his gun and was going to kill him, then ran out of the door.  Mr. Paulk believed at that time that the Defendant had the power to execute the threat.  Mr. Paulk explained that the Defendant went back behind the building, got in his truck, and drove away.  After freeing himself, Mr. Paulk observed the direction in which the Defendant was driving and called 911 and reported the crime.

Corporal Kenneth Rachal of the Alexandria Police Department was dispatched to the crime scene and interviewed Mr. Paulk.  Upon learning that the assailant left the scene in a brown Suburban and the direction it was headed, Corporal Rachal instructed Officer Ducote to see if he could locate the vehicle.  Corporal Rachal joined Officer Ducote after locating the vehicle at a residence of Nicole Howard and the officers learned that the vehicle belonged to the Defendant and that the Defendant was inside the residence. The Defendant came out of the house, was informed of his *Miranda* rights, arrested for outstanding warrants, and  placed in the back of a police

4

unit. At that time, the Defendant told the officers where the stolen items were located. After officers were given consent by Ms. Howard to search the residence, the items were retrieved from the exact locations as reported by the Defendant. Corporal Rachal testified that, when searching the residence for the stolen items, he did not look for a weapon at that time.

Officer Douglas Prestridge of the Alexandria Police Department testified that he was dispatched to the scene of the crime around 10:00 a.m. Officer Prestridge did not find a weapon at the crime scene. Detective Stephen Constantino testified that the Defendant's vehicle was thoroughly searched and a weapon was not found. Officer James David King was present when the Defendant disrobed at the hospital, and he testified that no weapon was found.

In his brief to this court, the Defendant maintains that under a traditional strict interpretation of this statute, the jury could not have concluded beyond a reasonable doubt that the Defendant used force or intimidation to commit the taking while leading the victim to believe he was armed with a dangerous weapon. The Defendant explains that the statute makes no mention of the use of force or intimidation to retain the property or effect escape. In support of his argument, the Defendant refers this court to *State v. Fortune*, 608 So.2d 148 (La.1992). In *Fortune*, the court provided the following interpretation of the first degree robbery statute, La.R.S. 14:64.1:

> The statute has objective and subjective components. It requires the state to prove that the offender induced a subjective belief in the victim that he was armed with a dangerous weapon, and that the victim's belief was objectively reasonable under the circumstances. The statute thus excludes unreasonable panic reactions by the victim but otherwise allows the victim's subjective beliefs to determine whether the offender has committed first degree robbery or the lesser offense of simple robbery in violation of La.R.S. 14:65. *Cf. State v. Byrd*, 385 So.2d 248 (La.1980). To this extent, La.R.S. 14:64.1 differs from other robbery statutes in which the threat of force alone constitutes a violation of the statute despite its failure to place an atypical victim in actual fear. *See Commonwealth v. Mays*, 248 Pa.Super. 318, 375 A.2d 116 (1977); *State*

5

*v. Birch*, 479 N.W.2d 284 (Iowa 1991).

*Id*. at 149.

In the instant case, the Defendant argues that Mr. Paulk only stated that the Defendant said he had a gun as he was leaving and that Mr. Paulk was already tied up and his possessions taken. The Defendant concludes that because there was no mention of a weapon, nor was one alluded to at the time of the taking, his conviction should be reversed, or this court should enter a conviction for simple robbery. Lastly, the Defendant complains that Mr. Paulk never identified the Defendant at trial as the individual who assaulted him and stole his wallet and checkbook.

The court finds, using the analysis set forth in *Fortune*, the evidence in the record clearly supports the jury's verdict of first degree robbery. Mr. Paulk's testimony demonstrated the subjective belief that the Defendant was armed with a dangerous weapon at the time Mr. Paulk's possessions were taken. First, the Defendant was extremely physical with Mr. Paulk, smashing him into a wall and tying his hands behind his back several times. Then, during the time of this physical altercation with the Defendant, a man much larger than Mr. Paulk, Mr. Paulk saw the Defendant remove from his back pocket or waistband a brown object which could have been the butt of a gun or a knife.

Further, the objective components of the crime also support Mr. Paulk's belief that the Defendant was armed with a dangerous weapon. Considering Mr. Paulk's position, face down on the floor with the Defendant on his back at the time the Defendant pulled out the object seen by Mr. Paulk, one could conclude it was reasonable for him to believe that the object he saw was a possible weapon. Mr. Paulk expressed his fear of the Defendant from the outset of the crime and, as mentioned above, the Defendant was extremely physical with Mr. Paulk and the

6

Defendant was much larger than he. Considering same, we find that these facts exclude any possibility that Mr. Paulk experienced an unreasonable panic reaction as described in *Fortune* with regard to his belief that the Defendant was armed with a dangerous weapon.

Next, the Defendant complains that Mr. Paulk never identified the Defendant at trial as the individual who assaulted him and stole his wallet and checkbook. The record confirms that Mr. Paulk did not identify the Defendant at trial. Mr. Paulk did, however, identify the Defendant in a photograph taken at Ms. Howard's residence on the day of the crime when shown the photograph at trial. Mr. Paulk also identified the Defendant's getaway vehicle in a photograph. Additionally, Officer Rachal identified the Defendant in the courtroom as the person who told him where the wallet and checkbook were located. Further, Sergeant Gleason, the officer that placed the Defendant in handcuffs at the time of his arrest, identified the Defendant in the courtroom as the same person he had arrested that day. Considering Mr. Paulk's identification of the Defendant in the photograph submitted into evidence, as well as the identification of the Defendant by the officers involved in the investigation, we find that the identification of the Defendant as Mr. Paulk's assailant was sufficiently proven at trial.

**SUPPLEMENTAL ASSIGNMENT OF ERROR AND PRO SE SUPPLEMENTAL ASSIGNMENTS OF ERROR NUMBER TWO AND THREE**

Counsel for the Defendant filed a supplement brief setting forth a supplemental assignment of error. Additionally, the Defendant filed, *pro se*, a supplemental brief alleging the same assignment of error in supplemental assignments of error number two and three.

7

Counsel for the Defendant argues that the trial court erred in denying his motion to suppress the Defendant's statement wherein he told officers where to locate Mr. Paulk's wallet and checkbook inside Ms. Howard's residence. The Defendant, *pro se*, asserts that his statement was not given freely and voluntarily because he was unable to understand his rights in his intoxicated condition. Further, the Defendant maintains that he was not properly advised of his *Miranda* rights because he was in a state of incapacitation.

In his motion to suppress filed on June 12, 2006, the Defendant asserted to the trial court that he was visibly sick and ill, and after being arrested, he had to be rushed to the emergency room. The Defendant maintained that he "was in a sick state of drug substance abuse state of mental illness and did not know what he was doing or saying due to his being sick for drugs." [sic]. Accordingly, the Defendant maintained that the evidence obtained as a result of questions the Defendant answered following his arrest is fruit of the poisonous tree. The Defendant averred that he was not in his right state of mind and could not give voluntary consent to be questioned. Further, the Defendant complained that he was arrested for a non-related violation, and therefore, the officers did not have probable cause to search Ms. Howard's residence. The Defendant concludes that the officers found the robbery evidence through improper questioning of the Defendant and the illegal search of Ms. Howard's residence without probable cause or proper consent.

The trial court denied the Defendant's motion without a hearing on June 15, 2006. In its handwritten reason for denying the motion, the trial court stated, "Motion denied; the motion is so grammatically incorrect that it lacks merit on its face."

A second motion to suppress was filed by the Defendant on June 26, 2006, and a contradictory hearing was held on August 28, 2006. In denying the Defendant's

8

motion, the trial court stated:

> I find that the statements that he made to Officer Rachal and Gleason were free and voluntary. The evidence is that there was a robbery reported, that they had information to believe that he may have been the defendant and they knew of the approximate location where they could find him. They went to that location. Officer Rachal said that he asked him some questions -- well, he advised him of his rights. That at the time that he was discussing his rights with him and the evidence about this crime, that he did not appear to be in any distress whatsoever, that he understood the rights, he did not appear to be under the influence of drugs, that he made his statement, that he consented freely and voluntarily. And it was only after he was placed in the police car that he complained of chest pains. That was after the statements were made. I have no evidence before me today to show that he had recently ingested crack cocaine. And even if he had ingested crack cocaine, the law says, "Likewise, intoxication does not vitiate a confession unless it is to the degree of nullifying the accused's comprehension and renders him unconscious of the consequences of what he is saying." *State v. Fugler*, which is 721 So.2d 1, *State v. Ouzts*, 777 So.2d 1286, *State v. Toney*, 796 So.2d 1, and *State v. Barthe*, 806 So.2d 53. And there's other cases that are listed. I'm not going to cite all those. But I don't believe that there was any intoxication to the degree to nullify his comprehension or render him unconscious. Obviously, that was not present. I believe that he knew what was going on, he was responsive to the questions, he answered their questions and only after answering those questions and being arrested on the charge did he complain about chest pains. So -- and I don't know if that was a valid complaint or not about whether or not he had chest pains -- so I am going to order that the motion to suppress be denied.

In his brief to this court, the Defendant asserts that he was taken to the hospital immediately after giving his statement due to complaints of chest pains and his admission of having just smoked crack cocaine. According to the Defendant, he was unable to sign his advice of rights form at 10:45 a.m. Further, the Defendant refers this court to the hospital discharge summary which allegedly states that the Defendant's hands and fingers appeared to be sooty and burned and his lips blistered from smoking crack cocaine. The Defendant asserts that he was given Ativan and Morphine until his condition improved and that he was diagnosed with rhabdomyolysis secondary to cocaine. In his *pro se* brief to this court, the Defendant complains that the trial court erred because it chose to ignore the medical reports and

9

findings of the treating physician which he maintains clearly show that he had ingested a large quantity of crack cocaine. The Defendant also contends that greater weight should have been given to his medical records than to the testimony of the "admission worker/intake officer's" comments.

With regard to the advice of rights form, the document reflects the signatures of Officer Rachal and Sergeant Gleason as witnesses and indicates that the Defendant was unable to sign, but gave his verbal understanding of his rights. At the hearing, Detective Darrell Thiels testified that he was dispatched to the location where the Defendant was apprehended. Detective Thiels stated that the Defendant was unable to sign the advice of rights form because he was at the hospital at the time the form was completed. Detective Thiels explained that the advice of rights form, as well as the booking sheet and felony bond sheet, were filled out as they are in all normal arrests and they were presented to the booking officer so the Defendant could be booked. Thus, Detective Thiel's testimony suggests that the lack of the Defendant's signature was due to his absence, not because he did not understand his rights.

Further, Detective Thiels stated that he had the chance to speak to the Defendant before he went to the hospital and the Defendant did not appear disoriented or to be under the influence of drugs or alcohol. Further, the Defendant appeared to be able to understand everything that was going on. Detective Thiels also testified that the Defendant was sweating profusely but did not indicate to any of the officers that he had used drugs or alcohol. On cross-examination, Detective Thiels stated that in his seventeen years of being on the force, he would recognize if someone was on crack cocaine and that the Defendant did not appear to be on crack cocaine. Detective Thiels attributed the Defendant's sweating to the unseasonably warm temperature and because the Defendant was very nervous.

Officers Rachal and Gleason also testified at the hearing regarding the Defendant's mental orientation at the time of his statement. Officer Rachal stated that he verbally advised the Defendant of his rights prior to putting him in the police unit, but he did not have an advice of rights form with him at that time. In Officer Rachal's opinion, he believed that the Defendant appeared to understand his rights, and based on his knowledge, training, and experience, the Defendant did not appear to be under the influence of alcohol or drugs. Officer Rachal stated that he has arrested people under the influence of crack cocaine and other illegal narcotics and would recognize a person disoriented because of drugs. The Defendant was able to coherently convey his thoughts to the officers, speak in good English, and in complete sentences and his words were not slurred. The Defendant did not appear to be in any physical duress. Officer Rachal did admit, however, that the Defendant appeared nervous from the officers' presence and his wanting to know why the officers were there and the source of the problem. The Defendant was also sweating which Officer Rachal attributed to nervousness.

Officer Rachal also testified that, prior to reading the Defendant his rights, the Defendant wanted to say something. At that time, Officer Rachal stopped the Defendant and told him that the officers had to advise him of his rights first before he could say anything. After the Defendant was advised of his rights, he was asked if he wanted to make a statement which is when the Defendant told officers where the items were located in the residence. At no time did the Defendant tell Officer Rachal that he did not want to make a statement or invoke his right to counsel. Additionally, Officer Rachal stated that he did not threaten the Defendant in any way or promise him anything to induce his statement. According to Officer Rachal, the Defendant made his statement freely and voluntarily. Lastly, Officer Rachal testified that, prior

11

to giving his statement, the Defendant said nothing about being on crack or that he felt he was having a heart attack, nor did the Defendant complain of having chest pain before he was *Mirandized*. The Defendant did not tell Officer Rachal that he had ingested crack cocaine, nor did Officer Rachal ask the Defendant if he had been smoking crack cocaine. Officer Rachal estimated that the Defendant began complaining of chest pain fifteen to twenty minutes after he sat in the police unit.

Officer Gleason testified that the Defendant did not appear to be in any physical duress when he was approached on the porch of the residence. Also, Officer Gleason was standing next to Officer Rachal when the Defendant was verbally *Mirandized* by Officer Rachal, and the Defendant did not appear to be in any physical duress at that time. In Officer Gleason's opinion, based on his knowledge, training, and experience, the Defendant appeared to understand his rights and did not appear to be under the influence of any alcohol or drugs, nor was he disoriented. The Defendant was able to respond in a manner that the officers could understand. Based on what Officer Gleason witnessed, the Defendant appeared to make his statement freely and voluntarily.

Officer Gleason testified further that the Defendant did not appear nervous at first, but started sweating once he was put in the back of Officer Gleason's unit to secure him. He did not appear to have any health problems prior to the time Officer Gleason placed the Defendant in his unit. When the Defendant started to appear distressed, Officer Gleason got the Defendant out of the vehicle and removed the handcuffs securing his hands behind his back. Officer Gleason felt that the stress put on the Defendant with his arms behind his back may have added to his discomfort. The Defendant was then complaining of chest pain, but he did not tell the officers that he had smoked crack before their arrival.

12

To prove that the Defendant was not coherent or lucid at the time of his confession, the Defendant's medical records from L.S.U. Huey P. Long Charity Hospital, where he was admitted following his arrest, were submitted into evidence. The trial court reviewed the medical records, and defense counsel directed the court to the pertinent pages pertaining to the Defendant's mental condition during his stay. Next, as part of the Defendant's argument, he maintained that his statement was made under physical and mental duress because he had ingested crack cocaine. The trial court asked for evidence that the Defendant had ingested cocaine. The Defendant referred the trial court to the medical records. The trial court asked defense counsel to show him one page that supported the Defendant's argument and was unable to do so other than references made to traces of crack cocaine and other illegal substances in the Defendant's urine. Thus, other than the Defendant's own statement to defense counsel and/or the hospital that he had ingested cocaine prior to being questioned and the medical records submitted, the Defendant offered no other evidence at the hearing that the Defendant's cocaine use interfered with the understanding of his rights and his subsequent confession. The Defendant did not testify at the hearing that he used cocaine prior to making his statement or, as a result of same, that he was incoherent at the time of his confession.

A review of the Defendant's medical records indicates that he was admitted to the emergency room and seen by a triage nurse at 1:01 p.m. with the chief complaint of chest pain, sudden onset, after smoking crack that morning. He also complained of a burn to his right middle finger from a crack pipe. The triage nurse noted that the Defendant was alert and in no acute distress, his breathing pattern was normal, his skin was dry, pink, and warm, and he was awake, alert, and oriented to person, place, and time. The Defendant was described as calm and cooperative.

13

At 1:06 p.m., Dr. William Clark examined the Defendant. The Defendant reported to Dr. Clark that the burns to his finger were from chronic crack use. Dr. Clark's examination revealed no significant abnormality in any of his body systems, including his neurological functioning. Dr. Clark reported that the Defendant was in no acute change from his baseline condition, appearance, and health, and was non-toxic and in no apparent distress. The Defendant's cranial nerves were intact, he was active neurologically, had no extremity weakness, ambulated without difficulty, and his mental status was baseline for his age, gender, and conditions. The Defendant had no sensory deficits and was awake, alert, and oriented as to person, place, and time.

A patient rights/advance directive acknowledgment statement was given to the Defendant by the admit clerk who advised the Defendant of his patient rights and responsibilities. The Defendant acknowledged that he had received the information by signing and dating the top portion of the form. The bottom portion of the form was to be completed by the Defendant's admitting nurse who indicated that the Defendant was falling asleep during the interview, and she was unable to discuss whether he desired to establish an advance directive at that time. We note that the time the form was completed by the admit clerk or admitting nurse is not indicated on the document and, thus, it is not possible to determine whether the form was completed at the time of his arrival at the emergency room or when he was transferred from the emergency room to the hospital unit at 5:40 p.m. for further observation. The Defendant could have been medicated prior to receiving the form. The medical records indicate that the Defendant was given 2 mg of Ativan IV at 1:27 p.m. Also, the Defendant was given 6 mg of Morphine IV at 4:03 p.m. after complaining at 3:55 p.m. of a throbbing sensation to his left index finger.

14

The Defendant's hospital discharge summary reflects an admitting diagnosis of "rhabdomyolysis secondary to cocaine; rule out acute coronary syndrome." He was discharged on January 26, 2006, and no discharge diagnosis is noted. The history of his present illness indicates that he presented with left-sided chest pain and left arm pain, no diaphoresis, and pain at the left index finger.[1] The Defendant reported a myocardial infarction at age 21 which the physician found questionable. In his social history, the Defendant admitted to smoking cocaine. During the course of his hospitalization, the Defendant's cardiac status improved as reflected in the cardiac lab results. The focus of his stay turned to his left index finger which had an abscess and to a cyst on his neck located in the upper right side of the neck. During his stay, the Defendant underwent an incision and drainage of an abscess on his left index finger and the subcutaneous cyst on his neck was removed.

As noted by this court in *State v. Brooks*, 505 So.2d 245, 247 (La.App. 3 Cir. 1987),

> Before a confession can be introduced into evidence, the state has the burden of proving that the confession was free and voluntary. La.R.S. 15:451. Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. *State v. Robinson*, 384 So.2d 332, 335 (La.1980).

Additionally, the supreme court noted in *State v. Manning*, 03-1982, p. 26 (La. 10/19/04), 885 So.2d 1044, 1074, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745 (2005). that "the mere fact of drug or alcohol intoxication is insufficient standing alone to

---

[1]Diaphoresis is defined as profuse sweating.

15

render a confession involuntary. *See State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450 (1994)(confession voluntary although defendant had smoked three or four cocaine rocks the night before his 11 p.m. statement, as well as consumed several beers the day he confessed)."

In the instant case, we find that the evidence adduced at the hearing on the Defendant's motion to suppress clearly indicates that the Defendant used crack cocaine. However, there was no evidence that the Defendant was under the influence of crack cocaine at the time of his confession to the extent that it negated his comprehension and rendered him unaware of the consequences of what he was saying.

The Defendant correctly asserts that he was taken to the hospital immediately after giving his statement due to complaints of chest pains. However, there is no evidence, as alleged by the Defendant, that he admitted or reported to the arresting officers that he had just smoked crack cocaine which was allegedly causing his chest pain. Further, the testimonies of Officers Rachal and Gleason and Detective Thiels indicate that the Defendant did not appear to be under the influence of drugs and appeared to understand his rights. All three officers had experience with identifying drug intoxication and disorientation. The Defendant did not report cocaine use until he presented to the hospital, and even then, the physical assessment by the emergency room nurse and physician both indicate that the Defendant was in no acute or apparent distress, was oriented to person, place, and time, was neurologically intact and had no sensory deficits.

As to the Defendant's allegation that he was unable to sign his advise of rights form at 10:45 a.m., Officers Rachal and Gleason and Detective Thiels explained that the Defendant had gone to the hospital before they had the chance to present the form

16

to the Defendant for his signature. Thus, the lack of a signature was due to the Defendant's absence, not because of his inability to sign the document. The Defendant's hospital discharge summary supports his contention that he abuses cocaine and reflects a diagnosis of Rhabdomyolysis secondary to cocaine. However, the document does not reflect that the Defendant was incoherent from cocaine ingestion at the time he was *Mirandized*. The Defendant was given Ativan and Morphine as stated in his brief. We note, however, that the Morphine was given to relieve pain in his left index finger and was not related to cocaine ingestion.

As to the Defendant's sleepiness during the interview upon his admission to the hospital, we mentioned above that the time the form was filled out is unknown. Further, the form could have been filled out up his arrival at the emergency room or at the time of his admission to the hospital. The Defendant was medicated on two separate occasions, either of which could have caused the Defendant's drowsiness. Without any additional information, the fact that the Defendant was falling asleep at the time his admit nurse was completing the lower portion of the patient rights/advance directive acknowledgment statement does not prove that the Defendant was incapacitated from cocaine at the time he was *Mirandized*.

Considering the evidence presented at the hearing, we find that the State met its burden of proving that the Defendant's confession was free and voluntary. The evidence supports the State's contention that Defendant was properly advised of his *Miranda* rights as he has not shown that he was in a state of incapacitation at that time. Accordingly, we find that these assignments of error are without merit.

## CONCLUSION

The Defendant's conviction is affirmed.

**AFFIRMED.**

17