STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-351


STATE OF LOUISIANA

VERSUS

DEWAYNE FITZGERALD POULLARD


**********


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 19-K-5161-D
HONORABLE D. JASON MECHE, DISTRICT JUDGE


**********


**WILBUR L. STILES**
**JUDGE**


**********


Court composed of Elizabeth A. Pickett, Guy E. Bradberry, and Wilbur L. Stiles, Judges.


**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 6547**
**Lake Charles, LA 70606-6547**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Dewayne Fitzgerald Poullard**

**Chad Patrick Pitre**
**District Attorney, Twenty-Seventh Judicial District**
**Kathleen E. Ryan**
**Assistant District Attorney**
**P.O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR STATE/APPELLEE:**
    **State of Louisiana**

**STILES, Judge.**

A grand jury indicted Defendant, Dewayne Fitzgerald Poullard, for the second degree murder of Chance Greene. Defendant was subsequently found guilty by a unanimous jury of manslaughter, a responsive verdict. The trial court sentenced Defendant to serve thirty-five years at hard labor. Defendant has appealed both his conviction and sentence. We affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On December 7, 2019, a 911 call was received reporting that a body had been found near a gully under a bridge. Law enforcement responded to the scene and recovered the body, as well as various items found near the body believed to be evidence. One of the items recovered was a tote, described as a large black plastic container with two wheels. Attached to the side of the tote was a sticker with a bar code. After visiting several stores, law enforcement learned that three such totes were purchased from a local Lowe's store in the preceding few weeks. Store surveillance revealed that two of the totes were purchased with credit cards, and the third one was purchased with cash on the day prior to the discovery of the body. Security footage showed the purchaser of that tote speaking with a store employee. The employee informed law enforcement that although he could not recall the man's name, he knew he had worked at Wendy's and O'Reilly's. The manager at Wendy's was shown a picture of the man who purchased the tote at Lowe's and identified him as Defendant.

On December 9, 2019, after learning Defendant's identity, detectives located him pulling up to his grandmother's house after work. They requested that he speak with them at the St. Landry Parish Sheriff's Office. Defendant agreed and drove himself in his own vehicle to the station, followed by the two officers. During an

interview which lasted over three hours, Defendant admitted to driving around with Chance Greene, the victim, on December 4, 2019. The two went to the home of Joseph Washington, a friend of Defendant's, who had given him access to his house on Park Circle in Opelousas. Security footage taken from inside the house showed Defendant and Greene entering just before 3:00 a.m. on December 4, 2019. According to Defendant's statement, Greene demanded that Defendant perform oral sex on him, or he would "out" Defendant as gay to his friends and family. Defendant complied with Greene's demand for oral sex but stated that he was angered by the situation. The two argued and Defendant shot Greene twice in the torso with a .380 handgun. The gun had been given to Defendant by Washington on November 23, 2019. At 3:03 a.m., a dispatcher with the Opelousas Police Department received a call reporting shots being fired in the Park Circle area. Officers responded to the call but saw nothing out of the ordinary.

After the shooting, Defendant hid Greene's body in an infrequently used back bedroom at Washington's house. On the evening of December 6, 2019, Defendant bought the tote at Lowe's. He then returned to Washington's house in the early morning hours of December 7, 2019, loaded Green's body into the tote, attempted to clean the house, and then dumped the tote and the body into the gully where they were later found.

During his interview, Defendant informed detectives that the .380 handgun was in his car. Law enforcement searched his car and located the .380 handgun in the passenger-side rear pocket. Other items of evidence found near the body in the gully matched items found in Washington's house, such as a red bed sheet, a curtain with apples printed on it, and a piece of linoleum flooring. Blood matching the victim

was found on carpet samples taken from Washington's house and on a pair of Jordan tennis shoes seized from Defendant's grandmother's house.

Dr. Christopher Tate, a forensic pathologist, conducted the autopsy on the victim. He testified that two bullets entered the victim's body through the same wound in his chest. One bullet exited the body while the other bullet was found in the victim's backbone. Dr. Tate was unable to say whether the gun was pointed at the body or being waived around at the time the shots were fired.

On August 4, 2020, a grand jury indicted Defendant for the second degree murder of Greene, in violation of La.R.S. 14:30.1. Prior to trial, the State filed a motion in limine seeking the admission of Defendant's December 9, 2019 statement wherein he admitted killing Greene and dumping his body. After a hearing, the trial court ruled that Defendant's confession was admissible at trial. Defendant's trial began on January 30, 2024. On February 4, 2024, a unanimous jury found Defendant guilty of the responsive verdict of manslaughter. On April 25, 2024, the trial court sentenced Defendant to thirty-five years at hard labor, with credit for time served from the date of arrest through the date of sentencing.

Defendant has appealed, asserting two assignments of error:

1) The trial court erred in concluding that the State sufficiently established that Dewayne Poullard's confession was freely and voluntarily given.

2) The sentence imposed by the trial court violates the Eighth Amendment of the Constitution of the United States and La. Const. Art. I, § 20, as it is nothing more than cruel and unusual punishment and, thus, excessive. The facts of this case and of this offender do not warrant the upper-range sentence of thirty-five years at hard labor imposed by the trial court.

3

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant contends that the trial court erred in concluding that the State established his December 9, 2019 confession was freely and voluntarily given and in allowing its admission at trial. Defendant argues that the evidence presented at the hearing on the State's motion in limine supports a finding that he did not comprehend his rights. Defendant first claims that he consumed alcohol and illegal substances within the hour before he was questioned, as evidenced by the containers of alcohol and bag of pills law enforcement found in his car. Additionally, Defendant claims that he misunderstood that Detective Graig Leblanc had an adversarial role in the interrogation process, as he viewed Detective Leblanc as a family friend and counselor. Finally, Defendant claims he had been promised he could go home after speaking with detectives. Defendant requests a new trial at which the State would be prohibited from introducing his statement.

### *Motion in Limine*

At the hearing on the State's motion in limine, Detective John Cormier, a captain with the St. Landry Parish Sheriff's Department in the Criminal Investigation Division, testified that he and Detective Leblanc interrogated Defendant on December 9, 2019, at the St. Landry Parish Sheriff Department Public Safety Complex. Defendant arrived there in his own vehicle followed by Detectives Adam Rivette and Donald Thompson. Detective Cormier testified that he orally advised

Defendant of his rights, after which Defendant initialed and signed the *Miranda*[1] rights form. Detective Cormier further testified that Defendant told him he could read and write, appeared to understand his rights, and agreed to speak with detectives. Defendant admitted to drinking a ten-ounce Budweiser beer an hour prior to the interview, as noted on his *Miranda* rights form, but when asked by Detective Cormier whether that rendered him impaired at the time of the interview, Defendant said "no." According to Detective Cormier, the entire interview was recorded, no other conversations took place outside of the interview room, and no threats, inducements, or promises were made to Defendant in order to obtain answers to the questions. Detective Cormier testified that Defendant did not appear intimidated, and he was not handcuffed at any time during this process.

Detective Cormier was questioned about signs which indicate whether someone is under the influence of drugs or alcohol. He responded that he looks for slurred speech, bloodshot/glossy eyes, uncontrolled movements, and slow responses to questions. He testified that Defendant did not display any of these signs and at no time did he feel that Defendant did not understand the consequences of what he was telling detectives.

On cross-examination, Detective Cormier affirmed that he had no training in identifying when someone was under the influence of narcotics beyond detecting impairment with the operation of a motor vehicle. He confirmed that he would not be able to identify whether someone was under the influence of narcotics without the requisite training and that he was not familiar with polysubstance abuse when stimulants and depressants are mixed, modifying the effects of the substances.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

After viewing the portion of the recorded interview during which Defendant was read his *Miranda* rights, Detective Cormier was questioned about Defendant's signing of the *Miranda* form:

> [Mr. Cameron Pontiff]: Detective Cormier, when you were discussing the form with Mr. Poullard and asking him why he put his initials next to each right, did he tell you that he was just doing what you told him to do? What law enforcement wants him to do?
>
> A. Yes.
>
> Q. Isn't that the only reason he was there is because he was trying to comply with what law enforcement requested of him?
>
> A. Yes.
>
> Q. And that the only reason he agreed to speak with you is because he was doing what you wanted him to do?
>
> A. Yes.

While Detective Cormier acknowledged that the *Miranda* form does not specifically state verbatim that the suspect waives his rights by speaking to law enforcement, he noted that the form does state, "You can decide at anytime to exercise these rights and not answer any questions or make any statement."

On redirect examination, Detective Cormier confirmed that at the beginning of the interview, Defendant was able to recall all the contact information for his family members. Detective Cormier also explained that he interpreted Defendant's statement that he was doing "what you told me to do" as "him following my instructions as per the *Miranda* warning." Defendant was instructed to initial next to each numbered warning as acknowledgement that he had read them himself after having them read to him by Detective Cormier. Detective Cormier testified that the best he could tell, Defendant read the *Miranda* form before he initialed and signed in the appropriate areas.

Graig Leblanc, currently Chief of Police for the Opelousas Police Department, testified that in December of 2019, he was an investigator with the St. Landry Parish Sheriff's Office and that he assisted with Defendant's interview. When asked what signs of intoxication he looks for in a suspect, he stated odor of alcoholic beverages, slumped posture, glossy eyes, and a lisp when speaking. During the December 9, 2019 interview, Chief Leblanc was seated next to Defendant. He testified that he smelled no alcohol and never felt that Defendant was unaware of his surroundings or of what was taking place. Chief Leblanc further testified that there were no threats, inducements, or promises made to Defendant and that Defendant did not appear to be under duress or fearful.

On cross-examination, Chief Leblanc confirmed that although he has Standard Field Sobriety Training and some training in the detection of narcotics, he is not proficient in detecting narcotics beyond looking for dilated pupils. Chief Leblanc confirmed that he knew "of" Defendant prior to the interview. When asked if he had assisted Defendant's brother in seeking substance abuse treatment, he explained, "I may have. I've assisted several individuals with trying to get their life together, and I may have assisted his brother. I'm not going to sit here and say I didn't. I really can't recall who that brother would be at this point. I would need a name." Chief Leblanc testified that Defendant was familiar with him when he entered the interview room and Chief Leblanc recognized him "from seeing him around." At one point during the interview, Defendant asked Chief Leblanc to pray with him and when Defendant grabbed his hand during emotional points of the interview, Chief Leblanc did not let go.

Defendant testified at the motion in limine hearing that he has a seventh-grade education and struggles with reading comprehension. The December 4, 2019

interview was his first interrogation and the first time he had seen a *Miranda* waiver form. He testified that after getting off work that day, he took two "X" pills and snorted two lines of cocaine prior to drinking Jack Daniels and a couple of beers. All of this was done in his car. No more than an hour later, law enforcement arrived at his grandmother's house. According to Defendant, the effects of the drugs and alcohol intensified the longer they were in his system. Defendant testified that he did not understand the *Miranda* form and "was just 'doin' it 'cuz' I was told to do it." When asked why he decided to speak with law enforcement when they approached him at his grandmother's house, Defendant stated:

> Because they told me that they need me down the station to ask questions, and I went on "wit" it and they said that I'd be home shortly. They even told my grandmother that I was "gonna" be home shortly, so I just "applied" to whatever they wanted me to do.

He confirmed that he thought if he cooperated, they would let him go home. Defendant was asked if Detective Cormier explained to him that he would be giving up his rights by speaking with him, to which Defendant responded, "No, sir."

When asked whether he knew Chief Leblanc prior to the December 9, 2019 interview, Defendant said, "Yes, I 'seen' him around a lot, and he helped 'wit' my brother in the past to 'git' through some problems he was 'goin' through, and everything. So, I'd know him around. He's very well known." Defendant described their relationship as "most definitely a counselor. Somebody I can vent to." Defendant testified that Chief Leblanc's presence "most definitely" affected his willingness to speak to law enforcement because he made him feel comfortable. When asked whether he typically prays with people, Defendant said "no" but stated that he felt comfortable enough with Chief Leblanc to pray with him and hold his hand.

Defendant was asked if he was still feeling the effects of the drugs and alcohol at the time of the interview, to which he responded, "Yes, highly." He again stated that he thought "once I would comply 'wit' everything I was 'gonna' be 'goin' to my house."

On cross-examination, Defendant admitted that he did not tell anyone during his interview that he struggled with reading comprehension. He further admitted that while being advised of his *Miranda* warnings, he recalled saying, "yeah I know, I watch a lot of cop shows." When asked to elaborate, Defendant said, "'Meanin' that is cops 'ax' me questions I'm going to answer whatever and do whatever they want me to do." He first testified that he had not heard *Miranda* rights read on TV, but then stated that he had, just "[n]ot 'dealin' 'wit' me." He later testified that he "skimmed" the *Miranda* form but did not read it, although he indicated to Detective Cormier that he had.

Defendant testified that he recalled being pulled over by Detectives Rivette and Thompson around 8:30 or 9:00 after getting off work on December 9, 2019. He claimed he started consuming drugs and alcohol as he was leaving work, and that law enforcement met up with him an hour after he had left. Defendant said as soon as he got into his car, he consumed two "X" pills he had gotten from a co-worker and left additional pills he did not consume in his car. He then "did" two lines of cocaine in his car and left what remained in his car. He also drank the Jack Daniels and beers in his car. When asked what law enforcement found in his car, Defendant stated that they found unidentified pills and open containers of liquor but admitted that he did not know if they found cocaine. Defendant testified that he did not tell law enforcement during his interview that he was under the influence of drugs or alcohol because "I was smart to go home, so I know if I said anything to that they

'was' 'gonna' keep me." Defendant said he recalled asking law enforcement if he could go home, but did not recall their response.

When Defendant was asked how he was able to recall his grandmother's address and phone number, his mother's phone number, and his phone number so easily during the interview, he explained that those were things he had known his whole life and they had not changed. As for the detailed description of when he worked and what he did each day, he explained that he was able to do that because it is something he does every day. He confirmed that his ability to provide this information was not affected by his consumption of drugs and alcohol. When pressed, Defendant said he lied to Detective Cormier when he told him he had only consumed one ten-ounce beer. Defendant was then asked, "how do we know if you're lying now, or if you were lying then," to which he responded,

> Because, like I said, I was just- - -I didn't want to say anything for me not to go home. All they wanted me to do was come down to question- - -to the precinct, ask questions and I was 'gonna' be going home shortly. So, if I know the lawyers is 'gonna' say if I had any more alcohol, they 'was' 'gonna' keep me.

Detective Samuel Tidwell, Jr., a detective with the St. Landry Parish Sheriff's Office in the Criminal Investigations Division, was the next witness to testify. He testified that he searched Defendant's vehicle during the interview. Inside of the vehicle, he found an open container of alcohol in the center console, a second open container of alcohol in the front passenger seat, a small baggie with an assortment of unidentified pills, and a weapon in the back pocket of the passenger's seat.

On cross-examination, Detective Tidwell testified that he was searching Defendant's car for a .380 pistol because they had received information that the weapon was possibly in the car. They were not searching for alcohol or drugs, but during the search, they noted the alcohol bottles in the car were not full. Detective

Tidwell did not recall finding any cocaine or cocaine residue in the car, and he did not know what kind of pills were found in the car as they were not tested. While he did not initially recall any beer cans or drug paraphernalia being found in the car, on redirect examination, he acknowledged that his report indicated there were open beer containers in the vehicle.

Detective Adam Rivette with the St. Landry Parish Sheriff's Office assisted in the investigation of Defendant. On December 9, 2019, Detective Rivette and Detective Thompson approached Defendant as he was stepping out of his vehicle in front of his grandmother's house. Detective Rivette was "[c]onversation distance" from Defendant and did not notice any smell of alcohol on his breath. He testified that had he believed Defendant to be under the influence of drugs and alcohol, he would not have allowed him to drive to the Sheriff's complex. The two detectives followed Defendant to the complex and at no point did Defendant cross the center line, break any traffic laws, or give any indication that he was impaired. On cross-examination, Detective Rivette testified that he had no training to teach him how to identify whether someone was under the influence of either alcohol or illegal substances.

At the close of the hearing, the trial court recognized that the issue before it was to determine whether Defendant's statement was made freely and voluntarily as required by La.R.S. 15:451.[2] Citing *State v. Freeman*, 94-1132 (La.App. 3 Cir. 4/5/95), 653 So.2d 801, *writ denied*, 95-1156 (La. 106/95), 661 So.2d 464, the trial court stated:

[2] Louisiana Revised Statutes 15:451 provides, "Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."

11

Quoting from *Freeman*- - -and again, I'm ruling from the bench and my quotation may be more of a paraphrase, but I'll try to do my best. *Freeman* says, "Before the State may introduce a confession into evidence, it is incumbent upon it to affirmatively establish that the statement was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. In addition, if the confession was made during custodial interrogation, the State must prove that the accused was advised of his *Miranda* rights and that he knowingly and intelligently waived those rights.["]

Skipping down a bit, the opinion goes on to state, "This court and the Louisiana Supreme Court have held that a confession, which is challenged on the ground that the accused was chemically impaired at the time of interrogation, will be rendered inadmissible only when the impairment is of such a degree that it negated defendant's comprehension and rendered him unable to understand the consequences of his statement. Whether the impairment exists and is of a degree sufficient to vitiate the voluntariness of a confession is a question of fact, and the trial judge's findings will not be overturned unless they are not supported by the evidence." I'll stop there. Well, just to read the next sentence, "Our review of the record indicates that the trial court's finding that defendant's alleged chemical impairment did not render his confession involuntary is amply supported by the evidence."

The trial court next cited *State v. Coutee*, 07-568 (La.App. 3 Cir. 10/31/07), 970

So.2d 72, *writ denied*, 08-7 (La. 5/16/08), 980 So.2d 708:

I'm going to come back to *Freeman* in a minute, but I'll go next to *Coutee*, which was the next Third Circuit decision. It largely mirrored the same language, which I will not repeat, but there is a quotation in *Coutee* from *State v. Brooks*, which was an earlier Third Circuit decision found at 505 So.2d 245, 247 (La.App. 3 Cir. 1987). After the quotation there, the Third Circuit went on to say, "Additionally, the Supreme Court noted in *State v. Manning* that ['[']the mere fact that [sic] of drug or alcohol intoxication is insufficient standing alone to render a confession involuntary. Cite *State v. Davis* for the proposition that confession voluntary, although defendant had smoked three or four Cocaine rocks the night before his 11:00 p.m. statement, as well as consumed several beers the day he confessed.['"]

The court goes on to discuss the facts. It says, "In the instant case we find that the evidence deduced at the hearing on defendant's Motion to Suppress clearly indicates that that defendant used Crack Cocaine. However, there was no evidence that the defendant was under the influence of Crack Cocaine at the time of his confession to the extent that it negated his comprehension and rendered him unaware of the

consequences of what he was saying." Again, that's from *State v. Coutee*, 970 So.2d 72, 82.

The trial court goes on to cite several other cases on the same subject, before issuing the following ruling, during which it references the video of Defendant's interrogation:

> That being said, in this case I do find quite simply that what is relevant is what was on the video, which we introduced as Joint 1. A comparison of the defendant's statements, his demeanor, his mannerisms, all aspects of the statement in the interrogation room on December 9, 2019, when contrasted with his testimony here today, on January 19, 2024, show that his testimony today lacks all credibility. For him to try to come today to say that he consumed Ecstasy, Cocaine, Jack Daniels, and beer from the time he got off work until the time Detective Rivette and Detective Thompson asked him to go to the Sheriff's department is just incredible and especially not believable when you view the video. Granted, there's a few moments that I'm sure defense counsel will probably point out to the jury and the jury decides the weight that goes to the confession, but as far as whether the confession was made freely and voluntarily, I clearly find that it was.

> Secondly, again, I base that on watching all three hours and sixteen minutes of the video- - -some parts more than once. Clearly, I find he knew what he was doing. I understand there was a little bit [of] question about *Miranda*, but I do find, as the State pointed out, it was explained to him, he answered Detective Cormier's questions verbally. Tried to sign a little bit- - -tried to play a little game with the signature, but he did sign. And after that he clearly understood, answered- - - clearly understood the questions; answered them coherently. His answers were, for the most part, responsive. There were a few times that I found that he was being evasive, but I thought that was more of an intentional ploy rather than an indication that he was not making the answer freely or voluntarily. Additionally, I just find it hard to believe that two officers would have met with him out on the streets, interacted with him about needing to come to the Sheriff's complex to give an interrogation, and then would have allowed him to drive had they thought he was truly, in fact, in any degree impaired, or intoxicated, or otherwise unable to drive.

> Next, to deal with the intoxication again, I think the burden, as stated by defense counsel, the burden is on the defendant to show that the intoxication had an impact. And I think the burden there is preponderance of the evidence, not beyond a reasonable doubt. Again, to go back to *Freeman* and *Coutee* and *Boyer*, which I cited earlier, if I assume that he may have consumed some of the illegal drugs, some of the alcohol, or a combination of both, I do not find that his behavior

13

and his answers as demonstrated on the video rise to the level stated in those cases, that the intoxication existed and was of a degree sufficient to vitiate the voluntariness of his confession. I found he demonstrated comprehension throughout the statement, throughout the interrogation, and he was asked questions about- - -he made several statements throughout about going to jail, about not being allowed to go home, about having essentially made a mistake, or whatever, that showed he was "aware," not unaware, "aware" of the consequences of what was stated.

. . . .

Finally, there was an allegation that he didn't have sufficient reading comprehension. I'm going to go back to *Freeman*. In that case, Mr. Freeman was, by the court's words, a special education student. And I'm going to read this paragraph again, so that I don't misquote, but the Third Circuit in that case at around page 805, states, "An evidentiary presumption exists that an accused is sane and responsible for his actions. Because of the presumption, once the State establishes beyond a reasonable doubt that a confession was freely and voluntarily made, the 'defendant bears the burden of proving the existence of a mental abnormality which under the circumstances may have destroyed the voluntary nature of his confession. Thus, the burden of proof shifts to the defendant to prove that he has a mental defect that renders him unable to understand his rights, intelligently waive them, or that prevented his statement from being intelligently and voluntarily made.'" In this particular case, the Court went on to find, "For the reasons set forth above, the State proved beyond a reasonable doubt that defendant's confession was knowingly and voluntarily made. No evidence establishing a deficiency in defendant's mental condition was produced at trial or at the hearing on the motion to suppress. Thus, defendant failed in his burden of proving the existence of a mental defect, and his confession cannot be suppressed on this basis."

Legally, I don't think I have enough evidence of any mental illness or any mental abnormality that would rise to the level that I just stated. Further, I feel factually that, again, his answers, his behavior, his mannerisms, everything about his statement would undermine his allegation that his reading comprehension was so poor that he didn't understand what he was doing. Even if I assume that he has some reading comprehension problems, Detective Cormier explained it to him, he answered Detective Cormier's questions, Detective Cormier gave him a chance to read it, he signed it, he initialed it, and he freely and voluntarily answered many, many questions thereafter.

For all those reasons, I find the statement is made freely and voluntarily.
. . . .

14

MR. PONTIFF:

And Judge, just to clarify your ruling as it relates to the *Miranda* warnings, are you claiming that they were intelligently and knowingly waived?

THE COURT:

I do.

In *State v. Boyer*, 10-693 (La.App. 3 Cir. 2/2/11), 56 So.3d 1119 (alteration in original), *writ denied*, 11-769 (La. 1/20/12), 78 So.3d 138, the defendant appealed the trial court's denial of his motion to suppress his statements. This court upheld the trial court's ruling:

> Before a confession may be introduced into evidence, "it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." La.R.S. 15:451. The state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession at a hearing on a motion to suppress. *State v. Coleman*, [32,906 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218, *writ denied*, 00-1572 (La. 5/23/01), 787 So.2d 1010]; *State v. Hills*, 354 So.2d 186 (La.1977). The state must also affirmatively prove that the defendant was first advised of his *Miranda* rights and that the confession was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. *State v. Johnson*, 36,01 (La.App. 2d Cir. 6/12/02), 821 So.2d 652. The testimony of the interviewing police officer alone may be sufficient to prove the defendant's statement was given freely and voluntarily. *State v. Trotter*, 37,325 (La.App. 2d Cir. 8/22/03), 852 So.2d 1247, *writ denied*, 2003-2764 (La. 2/13/04), 867 So.2d 689, *recon. denied*, 2003-2764 (La. 4/23/04), 870 So.2d 282; *State v. Henderson*, 31,986 (La.App. 2d Cir. 8/18/99), 740 So.2d 240.
>
> In *State v. Jackson*, 381 So.2d 485 (La.1980), and *State v. Morvant*, 384 So.2d 765 (La.1980), the Louisiana Supreme Court stated the principles under which the admissibility of a confession must be judged. As a matter of federal constitutional law, a confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered

> involuntary and inadmissible. *See Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) and *State v. Roddy*, 33,112 (La.App. 2d Cir. 4/7/00), 756 So.2d 1272, *writ denied*, 2000-1427 (La. 5/11/01), 791 So.2d 1288.
>
> > The admissibility of a confession is a question for the trial court, whose conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. *State v. Coleman*, *supra*; *State v. Thibodeaux*, 98-1673 (La. 9/8/99), 750 So.2d 916, *cert. denied*, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). Because the trial court has the opportunity to observe the witnesses and assess their credibility, we place great weight on its factual determinations. *State v. Crews*, 28,153 (La.App. 2d Cir. 5/8/96), 674 So.2d 1082.

*State v. Roshell*, 40,374, pp. 5-7 (La.App. 2 Cir. 12/14/05), 916 So.2d 1268, 1271-72, *writ denied*, 06-771 (La. 10/6/06), 938 So.2d 69.

> . . . .

While the State had the burden of proving the admissibility of the confession at the motion hearing, Defendant had the burden of proving the grounds for his motion. La.Code Crim.P. art. 703(D)….

We find that the State met its burden of proof and that Defendant did not. In *State v. Freeman*, 94-1132, p. 6 (La.App. 3 Cir. 4/5/95), 653 So.2d 801, 804-05, *writ denied*, 95-1156 (La. 10/6/95), 661 So.2d 464, while discussing whether the defendant's confession was voluntary, this court stated:

> > This court and the Louisiana Supreme Court have held that a confession, which is challenged on the ground that the accused was chemically impaired at the time of interrogation, will be rendered inadmissible only when the impairment is of such a degree that it negated defendant's comprehension and rendered him unable to understand the consequences of his statement. *State v. Robinson*, 384 So.2d 332, 335 (La.1980); *State v. Brooks*, 505 So.2d 245, 247 (La.App. 3d Cir. 1987). Whether the impairment exists and is of a degree sufficient to vitiate the voluntariness of a confession is a question of fact, and the trial judge's findings will not be overturned unless they are not supported by the evidence. *Id*.

*See also State v. Guidry*, 94-678 (La.App. 3 Cir. 12/7/94), 647 So.2d 503, and *State v. Coutee*, 07-568 (La.App. 3 Cir. 10/31/07), 970 So.2d 72, *writ denied*, 08-07 (La. 5/1/08), 980 So.2d 708.

At the suppression hearing, Defendant asked the two detectives if they were aware that he had been shot at by police officers and whether they were aware that he was placed on a suicide watch by the Jacksonville police shortly after they finished with their interrogation. Both detectives stated that they had known shots were fired, but were not aware that Defendant had been considered suicidal. A review of the audiotape of the interrogation showed that Defendant answered questions calmly and clearly and never mentioned the fact that he was shot at by police. No evidence of Defendant's assertion that he became suicidal after the questioning was admitted at the suppression hearing. There is nothing in the record before this court to indicate that Defendant did not understand the consequences of his statements. Defendant's confession that he shot Bradlee Marsh was freely and voluntarily made.

*Id.* at 1137-38.

Additionally, in *Coutee*, 970 So.2d at 82, this court addressed a challenge to the voluntariness of a confession based on intoxication/drug use:

As noted by this court in *State v. Brooks*, 505 So.2d 245, 247 (La.App. 3 Cir. 1987),

Before a confession can be introduced into evidence, the state has the burden of proving that the confession was free and voluntary. La.R.S. 15:451. Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. *State v. Robinson*, 384 So.2d 332, 335 (La.1980).

Additionally, the supreme court noted in *State v. Manning*, 03-1982, p. 26 (La. 10/19/04), 885 So.2d 1044, 1074, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005)[,] that "the mere fact of drug or alcohol intoxication is insufficient standing alone to render a confession involuntary. *See State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994) (confession voluntary although defendant had smoked three or

four cocaine rocks the night before his 11 p.m. statement, as well as consumed several beers the day he confessed).”

In the instant case, we find that the evidence adduced at the hearing on Defendant's motion to suppress clearly indicates that the Defendant used crack cocaine. However, there is no evidence that the Defendant was under the influence of crack cocaine at the time of his confession to the extent that it negated his comprehension and rendered him unaware of the consequences of what he was saying.

Similarly, the supreme court stated in *State v. Bartie*, 19-1727, pp. 9-13 (La. 9/9/20), 340 So.3d 810, 814-16 (alterations in original):

> This court summarized the framework for evaluating the voluntariness of a confession in *State v. Turner*, 16-1841 (La. 12/5/18), 263 So.3d 337:
>
> > The analytical framework for evaluating the voluntariness of defendant's confession is well settled. The Supreme Court previously adhered to the view that any inducement "however slight" taints a confession. *Bram v. United States*, 168 U.S. 532, 542-43, 18 S.Ct. 183, 42 L.Ed.2d 568 (1897). However, under current standards, voluntariness is determined by the totality of the circumstances, with the ultimate focus on whether "the statement was the product of an essentially free and unconstrained choice or the result of an overborne will." *State v. Lewis*, 539 So.2d 1199, 1205 (La. 1989) (internal quotation marks and citation omitted). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 236, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."). What survives of *Bram* is the principle that a confession of guilt induced by a government promise of immunity is "coerced" and may not be used against the accused. *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963).
>
> *State v. Turner*, 16-1841, pp. 96-97, 263 So.3d at 399….
>
> . . . .
>
> As a general rule, this court reviews trial court rulings under a deferential standard with regard to factual and other trial determinations, while legal findings are subject to a de novo standard of review. *See State v. Hampton*, 98-0331, p. 18 (La. 4/23/99), 750 So.2d 867, 884;

> *see also* Crichton & Kottle, *Appealing Standards: Louisiana's Constitutional Provision Governing Appellate Review of Criminal Facts*, 79 La.L.Rev. 369, 382-84 (2018). When a trial court makes findings of fact based on the weight of the testimony and the credibility of witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings. *State v. Bourque*, 622 So.2d 198, 222 (La. 1993) (A "trial judge's ruling [on a fact question], based on conclusions of credibility and weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling.").

We have reviewed the video of Defendant's interrogation and confession and find that the trial court was very accurate in its interpretation and findings. Defendant's *Miranda* rights were thoroughly reviewed for him orally and there was no indication that he did not comprehend those rights. Additionally, there was no indication that Defendant was under the influence of drugs or alcohol to the point he was rendered incapable of clearly comprehending what was occurring. Defendant very quickly and easily provided his social security number and the addresses and phone numbers of close relatives. Although initially evasive and unwilling to admit his involvement in the killing of Greene, when presented with the surveillance images from Lowe's, Defendant admitted his involvement. While Defendant's testimony at the hearing was inconsistent with what was seen in the interrogation video, the trial judge made his credibility determination clear—that he did not believe Defendant's testimony at the hearing compared with what he saw on the video. As the trial court's conclusions as to credibility are entitled to great deference and there is evidence to support the trial court's findings, we uphold his ruling on the admissibility of the taped confession. Accordingly, there is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends that his sentence of thirty-five years at hard labor, just five years shy of the maximum sentence of forty years, is excessive.

In imposing Defendant's sentence, the trial court stated that it had reviewed all of the guidelines of La.Code Crim.Pro. art. 894.1, but that it was not going to go through every one. Instead, the court chose to focus on those it found most pertinent. The court first noted that although Defendant faced a second degree murder charge and potential life sentence without the benefit of probation, parole, or suspension of sentence, he received some mitigation when the jury instead found him guilty of manslaughter. The court then went on to state that it was "troubled greatly" by the testimony regarding the video cameras; the delay of time between the homicide and the disposal of Greene's body; the lack of a showing of remorse on the Lowe's security footage when Defendant purchased the tote to dispose of the body; the hiding of the body in Washington's house; the fact that Defendant loaded the body by himself, used chemicals to clean the home, and then poured those chemicals over the body; and finally, that Defendant dumped the victim's body in a canal. Additionally, the court noted that in Defendant's interview with the detectives, he was evasive until the point he realized they "had him." The court went on to state that it felt a lesser sentence would deprecate the seriousness of Defendant's crime. Additionally, the court found that Defendant's conduct manifested deliberate cruelty to the victim (if not in shooting him twice, then in the way he disposed of the body), actual violence was used, and a firearm was used. The court further found no indication that Greene was a physical threat to Defendant because it did not believe Greene provoked Defendant.

The court specifically noted that the offense resulted in significant permanent injury to Greene's family in the series of events that it set in motion. When Greene's mother learned that his body had been found, in her grief she ran out into the street and lay down. A passing motorist ran over her and hit two friends who were trying to remove her from the road. Greene's mother and one of her friends were killed and the second friend was injured.

As a mitigating factor, the court did note that this conviction made Defendant a first felony offender and that he had no significant criminal history prior to this incident.

On appeal, Defendant contends that the trial court failed to properly consider his prior work history and the needs of his family (both his grandparents and his child). Defendant additionally argues that the trial court's conclusion that he exhibited deliberate cruelty and caused significant injury to Greene are factors applicable in every manslaughter case. He points out that there was no evidence of torture or any other cruelty to Greene, and that the series of events resulting in the death of Greene's mother, the death of her friend, and the injury to another friend should not have been attributed to him as he could not have anticipated his actions would result in other deaths. Defendant further contends that the evidence did not establish a premeditated, deliberate act. He claims the surveillance camera in Washington's house was turned off to prevent Washington from viewing the sexual act between Defendant and Greene, and thus does not support a finding of a premeditated, deliberate act. Finally, Defendant contends he showed remorse when he broke down crying in the interview with detectives and in Washington's testimony that in the days following the shooting, Defendant was quiet, would stare out the window, and would cry, saying "it went off."

In response, the State contends that the evidence supported a conviction for second degree murder, but the jury returned a verdict of manslaughter. The State also notes that the surveillance video from inside Washington's home showed Greene seated calmly with no indication of a fight or tension between him and Defendant. Defendant then turned off the surveillance camera, and during the approximately three hours the camera remained off, Defendant shot Greene and hid his body. The State maintains that the trial court stated sufficient reasons at the sentencing hearing for sentencing Defendant to thirty-five years at hard labor and did not abuse its vast discretion in imposing the sentence.

In *State v. Russell*, 42,479, pp. 18-19 (La.App. 2 Cir. 9/26/07), 966 So.2d 154, 167, *writ denied*, 07-2069 (La. 3/7/08), 977 So.2d 897, the second circuit reviewed the imposition of the maximum sentence of forty years at hard labor in a manslaughter case:

> The offense of manslaughter is punishable by imprisonment at hard labor for not more than 40 years. La. R.S. 14:31(B). This court's case law on sentencing is well settled. The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. *State v. Smith*, 433 So.2d 688 (La.1983); *State v. Dunn*, 30,767 (La.App. 2d Cir. 6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So.2d 475 (La.1982); *State v. Hampton*, 38,017 (La.App. 2d Cir. 1/28/04), 865 So.2d 284, *writs denied*, 2004-0834 (La.3/11/05), 896 So.2d 57 and 2004-2380 (La. 6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation. *State v. Jones*, 398 So.2d 1049 (La.1981); *State v. Haley*, 38,258 (La.App. 2d

Cir. 4/22/04), 873 So.2d 747, *writ denied*, 2004-2606 (La. 6/24/05), 904 So.2d 728.

Second, a sentence violates La. Const. art. 1 § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Smith*, 2001-2574 (La. 1/14/03), 839 So.2d 1. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in the light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 2001-0467 (La. 1/15/02), 805 So.2d 166; *State v. Lobato*, 603 So.2d 739 (La.1992).

A trial court has broad discretion to sentence. Absent a showing of manifest abuse of that discretion, this court may not set aside a sentence as excessive. *State v. Guzman*, 99-1528, 99-1753 (La. 5/16/00), 769 So.2d 1158; *State v. June*, 38,440 (La.App. 2d Cir. 5/12/04), 873 So.2d 939.

In *State v. Hudson*, 33,357 (La.App. 2 Cir. 5/10/00), 760 So.2d 591, the defendant challenged the imposition of the maximum forty-year sentence for manslaughter based on his lack of a prior criminal record, gainful employment in a management position, and youthful age of twenty-four. Although he acknowledged his act of burning the victim's body was cruel, he claimed it was motivated by a sexual attack which caused him anger, shame, and embarrassment. The second circuit upheld the sentence, finding:

Here, the reasons articulated by the trial court appear more than adequate to support the imposition of even this maximum sentence. Defendant acted with deliberate cruelty to the victim. Defendant could have escaped; but, instead, he took the time to reload his weapon and shoot the victim several times. On this record, we do not find constitutional error. The sentence does not shock the sense of justice or reflect purposeless or needless infliction of pain and suffering, nor do we find the sentence to be out of proportion to the seriousness of the offense.

*Id*. at 602.

We find that the record reflects that the trial court adequately considered the guidelines of La.Code Crim.P. art. 894.1. As argued by Defendant, some of the factors mentioned by the trial court are typically present in manslaughter cases.

However, other factors specifically addressed by the trial court justified the sentence of thirty-five years at hard labor. *See Russell*, 966 So.2d at 168 ("While the defendant may be correct that some of the factors mentioned by the trial court during sentencing are typical in manslaughter cases and thus would not be relevant as aggravating factors, the trial court noted other factors that justify the maximum sentence.") The imposition of an upper-end thirty-five year sentence under the facts presented in this case does not constitute an abuse of discretion and is neither grossly disproportionate to the severity of the offense or shocking to the sense of justice. For these reasons, we find that this assignment of error has no merit.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**